IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

ENID SHEMPER,
Plaintiff,

Case no. 6:07-cv-782-ORL-31DAB

vs.

Judge/Magistrate: Presnell/Baker

UNIVERSITY VILLAGE AT MELBOURNE, LLLP.
Defendant.

_____/

### AMENDED COMPLAINT

Through counsel, Enid Shemper submits this amended complaint against University

Village at Melbourne, LLLP ("**University Village**"), stating as follows:

#### General Allegations

1.      Jurisdiction in this court is proper because this action presents a federal

question, as the claims asserted pertain to violations of Federal law. 28 U.S.C. §§1331.

2.      Venue in this court is proper, because this action pertains to rights and

responsibilities under a contract to be performed in this district (*i.e.*, Brevard County).

4.      All conditions precedent to the institution of this action have been performed,

have occurred, or have been waived.

5.      Shemper has retained undersigned counsel for legal representation, and

therefore she is obligated to pay said counsel a reasonable fee for that representation.

#### Factual Allegations

6.      On or about October 11, 2005, Shemper entered into an agreement (the

"**Contract**," a copy of which is attached and incorporated herein as Exhibit "A") with

University Village for the purchase of a Unit (the "**Unit**") in The Village at Melbourne ("**The Village**,") a condominium development in Brevard County.   Shemper gave University Village an initial deposit of $11,107.00 and an additional deposit of $2,500.00 for a total deposit of $13,607.00 (the "**Deposits**").

7.      On or about March 22, 2007, Shemper notified University Village she was revoking and terminating the Contract for failing to provide a property report as required by 15 U.S.C. §1703 of the Interstate Land Sales Full Disclosure Act ("**ILSA**"), and for failing to provide a tax disclosure as required by §689.261, Fla. Stat.   (a copy of this notice is attached as Exhibit "B").   This notice also demanded a return of the Deposit.

8.      University Village has not returned the Deposit.

**First Claim for Relief – Rescission for Violation of Federal Law (*i.e.*, 15U.S.C.§1703)**

9.      Paragraphs 1 through 8 are incorporated herein.

10.      The Contract was subject to the reporting and registration provisions of ILSA.

11.      University Village was not entitled to any exemptions from ILSA in constructing The Village..

12.      The Village consisted of more than 25 lots or units.

13.      The Contract did not unconditionally obligate University Village to erect the Unit within a period of two years.   The Contract's relevant clause (*i.e.*, sec. 5, "Completion Date") says:

> "It is estimated that the Unit and the Condominium shall be substantially completed
> by September 1, 2006.   Seller agrees to substantially complete construction of the
> Unit, in the manner specified in this Agreement, by a date not later than two (2) years
> from the date the Purchaser signs this Agreement; however, such completion date is
> subject to and shall be extended by reason of acts of God or by reason of

2

circumstances beyond the Seller's control including, but not limited to, work stoppages, the unavailability of labor or material, governmental orders and any other events which would support a defense based upon the impossibility of performance for reasons beyond the Seller's control."

This section made University Village's obligation to finish construction within two years illusory, because this obligation was conditional upon (or "subject to") certain enumerated contingencies that did not legally excuse University Village from performance under ILSA.

14.     The Contract also limited Shemper's damages to a return of the deposits. The Contract's relevant clause (*i.e.*, sec. 12.3) says:

"If Seller cannot provide marketable and insurable title to the Unit, as described above, Seller will have a reasonable period of time (at least one hundred and twenty (120) days) from the date of the scheduled Closing to attempt to correct any defects in title; provided, however, Seller shall not be obligated to incur any expense to clear title to the Unit. If Seller cannot or elects not to correct the title defects, Seller shall so notify Purchaser within such period, and Purchaser may thereafter elect (by written notice from Purchaser to Seller) one of the following two (2) options: (1) to accept title to the Unit in the condition offered (with defects) and pya the balance of the Total Purchase Price for the Unit (without set off or deduction therefor), thereby waiving any claim with respect to such title defects and Purchaser will not make any claims against Seller because of the title defects; or (2) to cancel this Agreement and receive a full refund of all monies deposited hereunder. If all monies deposited hereunder are refunded, Purchaser agrees to accept such monies as full payment of Seller's liability hereunder, whereupon this Agreement shall be terminated and Seller shall thereafter be relieved and released of all further liability hereunder."

This provision also made University Village obligation to finish construction within two years illusory, because the Deposits were an inconsequential amount to University Village.

15.     The transaction between Shemper and University Village was not a sale or lease of evidence of indebtedness secured by a mortgage or deed of trust on real estate.

16.     The transaction between Shemper and University Village was not a sale of securities issued by a real estate investment trust;

3

17.     The transaction between Shemper and University Village was not a sale of real estate by any government or government agency.

18.     The transaction between Shemper and University Village was not a sale of cemetery lots.

19.     Shemper is not in the business of constructing residential, commercial, or industrial buildings, nor did she purchase her unit for the purpose of reselling or leasing it to persons engaged such a business.

20.     The Village was not on real estate zoned for, or restricted to, use as industrial or commercial development.

21.     The Village contained more than 100 lots or units which were not exempt under 15 U.S.C. §1702(a).

22.     More than 12 lots or units in The Village had been sold or leased in the twelve-month period following the effective date of 15 U.S.C. §1702(b)(2).

23.     The Village did not consist of any noncontiguous parts.

24.     The Village did not consist of any lots or units of at least 20 acres, inclusive of easements for ingress and egress or public utilities.

25.     The Contract did not require delivery of a warranty deed (or, a deed or grant warranting that the grantor has not conveyed the lot or unit to another person and that the Unit is free from encumbrances made by the grantor or any other person claiming by, through, or under him), to Katz within 180 days after signing the Contract.

26.     No mobile home was to be erected or placed on the Unit.

27.     The operation for selling lots or units in The Village was interstate in nature, because University Village employed various means of interstate commerce (*i.e.*, U.S. Mail, the Internet, etc.) and offered units or lots for sale to residents from other states.

28.     The Unit was not free and clear of all liens, encumbrances, and adverse claims at the time Shemper signed the Contract, and it is still not free and clear of all liens, encumbrances, and adverse claims.

29.     Before executing the Contract, Shemper did not acknowledge in writing the receipt of a written statement by University Village containing good-faith estimates of the cost of providing electric, water, sewer, gas, and telephone service to the Unit.

30.     The Contract did not contain a clear and specific statement describing a good-faith estimate of the year of completion of, and the party responsible for, providing and maintaining the roads, water facilities, sewer facilities, and any existing or promised amenities.

31.     Prior to signing the Contract, Shemper did not acknowledge in writing receipt of a written statement by University Village setting forth (i) in descriptive and concise terms all liens, reservations, taxes, assessments, beneficial property restrictions which would be enforceable by other lot or unit owners or lessees in The Village, and adverse claims which are applicable to the Unit, and (ii) good-faith estimates of the cost of providing electric, water, sewer, gas, and telephone service to the Unit.

32.     University Village never provided Shemper with a property report (the "**Property Report**") and statement of record (the "**Statement of Record**") for the lot or Unit, as required by 15 U.S.C. §1703.

33.     Because of University Village's failure to provide Shemper with the Property Report and Statement of Record, she was entitled to rescind the Contract (pursuant to 15 U.S.C. §1703(c)), which she has properly done (Exhibit "B").

Wherefore, Shemper requests judgment for rescission of the Contract and return of the Deposits, plus damages, interest, costs, attorney's fees (pursuant to 15 USC §1709), and any other relief the court deems proper.

### Second Claim for Relief – Rescission/Voidability, pursuant to §689.261, Fla. Stat.

34.     Paragraphs 1 through 8 are incorporated herein.

35.     University Village never provided Shemper with a property-tax disclosure summary for her Unit (the "**Tax Disclosure**"), as required by §689.261, Fla. Stat, prior to or at the execution of the Contract.

36.     The failure of University Village to provide Shemper with the Tax Disclosure was a violation of §689.261, Fla. Stat., entitling her to rescind the Contract, which she has properly done (Exhibit "B").

Wherefore, Shemper requests a judgment for rescission of the Contract and return of the Deposits, plus interest, costs, and any other relief the court deems proper.

### Certificate of Service

I certify having mailed a copy of this amended complaint on June 15, 2007 to Moshe Shemesh, University Village at Melbourne, LLLP, 1001 North Federal Hwy., #315, Hallandale Beach, FL 33009

SARAGA & LIPSHY, P.A.

By: _____
Joseph Stern, Fla. Bar No. 30902
Attorneys for Enid Shemper
201 NE 1st Avenue
Delray Beach, Florida 33444
Tel: (561) 330-0660, Fax: (561) 330-0610
Stern@slpalaw.com

*Customer copy*

## PURCHASE AND SALE AGREEMENT

ORAL REPRESENTATIONS CANNOT BE RELIED UPON AS CORRECTLY STATING THE REPRESENTATIONS OF THE DEVELOPER (SELLER). FOR CORRECT REPRESENTATIONS, REFERENCE SHOULD BE MADE TO THIS CONTRACT (AGREEMENT) AND THE DOCUMENTS REQUIRED BY SECTION 718.503, FLORIDA STATUTES, TO BE FURNISHED BY A DEVELOPER TO A BUYER OR LESSEE.

ANY PAYMENT IN EXCESS OF TEN PERCENT (10%) OF THE PURCHASE PRICE MADE TO DEVELOPER (SELLER) PRIOR TO CLOSING PURSUANT TO THIS AGREEMENT MAY BE USED FOR CONSTRUCTION PURPOSES BY THE DEVELOPER (SELLER).

THIS PURCHASE AND SALE AGREEMENT ("Agreement") is made and entered into effective as of the 22 day of September, 2005 by and between UNIVERSITY VILLAGE AT MELBOURNE, LLLP, a Florida limited liability limited partnership, with an office at 1001 North Federal Highway, Suite 315, Hallandale, Florida 33009 ("Seller"), and the purchaser(s) named below ("Purchaser"):

| PURCHASER(S): | | | |
|---|---|---|---|
| 1. Enid Shemper | | | |
| 2. | | | |
| 3. | | | |
| 4. | | | |
| Purchaser Address: 603 Washington Ave. | | | |
| City: South Amboy | State/Country: N.J. | | Zip: 08879 |
| Home Telephone: 732-735-3938 | Facsimile Number: 732-316-0411 | | |
| Business Telephone Purchaser: | Email Address: ROCKY@LE DIST.COM | | |
| Business Telephone Second Purchaser: | Social Security Number/Passport Number: | | |

1.    Purchase and Sale. Purchaser hereby agrees to purchase from Seller, and Seller hereby agrees to sell and convey to Purchaser, Building 4, Unit No. U102 (the "Unit") within THE VILLAGE AT MELBOURNE, a Condominium (the "Condominium") being developed in Brevard County, Florida (the "County"), together with Parking Space No(s). 1 Assigned (the "Parking Space"), which Parking Space shall constitute a limited common element appurtenant to the Unit, together with all appurtenances thereto as the same are contained and defined in the Declaration of Condominium (the "Declaration") for the Condominium to be recorded among the Public Records of Brevard County, Florida.

2.    Purchase Price and Payments. The total purchase price ("Total Purchase Price") for the Unit being purchased hereunder, exclusive of any Closing Costs as described in Section 13 and elsewhere herein, will be as follows:

| PURCHASE | AMOUNT |
|---|---|
| Base Purchase Price | $ 136,070.00 |
| Options: | $ |
| | $ |
| | $ |
| | $ |
| Total Purchase Price: | $ 136,070.00 |


PLAINTIFF'S EXHIBIT
4

Purchaser shall make the following payments:

| PAYMENT | DUE DATE | AMOUNT |
|---|---|---|
| Initial Deposit | Balance of 10%<br>20% upon signing of Agreement | $ 11,107.00 |
| Additional Deposit | Reservation Deposit | $ 2,500.00 |
| BALANCE DUE BY CASHIER'S CHECK OR BY FEDERAL WIRE TRANSFER OF FUNDS (BANK CHECK OR OFFICIAL CHECK WILL NOT BE ACCEPTED) | At Closing (as defined in Section 11 hereof) | $ 122,463.00 |
| TOTAL | | $ 136,070.00 |

## ADDENDUM TO PURCHASE AGREEMENT

This Addendum is made this 10 day of October , 2005, by and between University Village at Melbourne, LLLP, a Florida Limited Liability Partnership ("Seller") and Enid Shemper ("Buyer"). The Addendum is made a part of the Agreement ("Agreement") entered into between Seller and Buyer for Unit No. 4102 ("Unit") of the proposed Village at Melbourne, a Condominium.

Seller and Buyer hereby agree to the following terms and conditions:

1.      Notwithstanding anything to the contrary, the Purchase Price shall be fixed to be 138,270.00 , and shall not be subject to any increase, except in the event of *force majeure*. In the event of *force majeure*, the Developer will absorb any increases up to 5% of the Purchase Price. If increase exceeds 5% of the above stated Purchase Price, Buyer shall have the option of either accepting the increase, or canceling the contract and receiving a full refund of deposits.

2.      As long as the Developer selects a majority of the Board of Directors of the Condominium Association, it will not restrict the Condominium Association approval to a prospective purchaser of the unit from Buyer.

3.      The Buyer shall have until October 17, 2005 to review the Condominium Prospectus and Contract. All Deposits shall be refundable until that time. If Buyer fails to execute and return the Purchase Agreement to Developer's Agent (together with the required initial deposit thereunder) by October 17, 2005, the Buyer's Reservation Agreement will be terminated.

Except as herein provided, all terms and conditions of the Agreement will remain in full force and effect.

IN WITNESS WHEREOF, the parties have executed this Addendum as of the day and year first above written.

SELLER:                                                    BUYER:
University Village of Melbourne, LLLP


_____                X_____
Authorized Signer

## PURCHASE AND SALE AGREEMENT

ORAL REPRESENTATIONS CANNOT BE RELIED UPON AS CORRECTLY STATING THE REPRESENTATIONS OF THE DEVELOPER (SELLER). FOR CORRECT REPRESENTATIONS, REFERENCE SHOULD BE MADE TO THIS CONTRACT (AGREEMENT) AND THE DOCUMENTS REQUIRED BY SECTION 718.503, FLORIDA STATUTES, TO BE FURNISHED BY A DEVELOPER TO A BUYER OR LESSEE.

ANY PAYMENT IN EXCESS OF TEN PERCENT (10%) OF THE PURCHASE PRICE MADE TO DEVELOPER (SELLER) PRIOR TO CLOSING PURSUANT TO THIS AGREEMENT MAY BE USED FOR CONSTRUCTION PURPOSES BY THE DEVELOPER (SELLER).

THIS PURCHASE AND SALE AGREEMENT ("**Agreement**") is made and entered into effective as of the 22 day of September , 2005 by and between UNIVERSITY VILLAGE AT MELBOURNE, LLLP, a Florida limited liability limited partnership, with an office at 1001 North Federal Highway, Suite 315, Hallandale, Florida 33009 ("**Seller**"), and the purchaser(s) named below ("**Purchaser**"):

| PURCHASER(S): | | |
|---|---|---|
| 1. Enid Shemper | | |
| 2. | | |
| 3. | | |
| 4. | | |
| Purchaser Address: 603 Washington Ave. | | |
| City: South Amboy | State/Country: N.J. | Zip: 08879 |
| Home Telephone: 732-735-3938 | Facsimile Number: 732-316-0411 | |
| Business Telephone Purchaser: | Email Address: ROCKYQLEDIST.com | |
| Business Telephone Second Purchaser: | Social Security Number/Passport Number: | |

1.  <u>Purchase and Sale</u>. Purchaser hereby agrees to purchase from Seller, and Seller hereby agrees to sell and convey to Purchaser, Building 4 , Unit No. 4102 (the "Unit") within THE VILLAGE AT MELBOURNE, a Condominium (the "**Condominium**") being developed in Brevard County, Florida (the "County"), together with Parking Space No(s). 1 Assigned (the "Parking Space"), which Parking Space shall constitute a limited common element appurtenant to the Unit, together with all appurtenances thereto as the same are contained and defined in the Declaration of Condominium (the "**Declaration**") for the Condominium to be recorded among the Public Records of Brevard County, Florida.

2.  <u>Purchase Price and Payments</u>. The total purchase price ("Total Purchase Price") for the Unit being purchased hereunder, exclusive of any Closing Costs as described in Section 13 and elsewhere herein, will be as follows:

| PURCHASE | AMOUNT |
|---|---|
| Base Purchase Price | $ 136,070.00 |
| Options: | $ |
| | $ |
| | $ |
| | $ |
| Total Purchase Price: | $ 136,070.00 |

Purchaser shall make the following payments:

| PAYMENT | DUE DATE | AMOUNT |
|---|---|---|
| Initial Deposit | Balance of 10% <br> 20% upon signing of Agreement | $ 11,107.00 |
| Additional Deposit | Reservation Deposit | $ 2,500.00 |
| BALANCE DUE BY CASHIER'S CHECK OR BY FEDERAL WIRE TRANSFER OF FUNDS (BANK CHECK OR OFFICIAL CHECK WILL NOT BE ACCEPTED) | At Closing (as defined in Section 11 hereof) | $ 122,463.00 |
| TOTAL | | $ 136,070.00 |

It is understood and agreed that, in addition to the Total Purchase Price, Purchaser shall pay all costs and fees listed in Section 13 below, including Purchaser's prorata share of the maintenance expenses due to The Village at Melbourne Condominium Association, Inc. (the "Condominium Association"). Current estimated maintenance expenses are set forth in the budget of the Condominium Association included in the Prospectus which is part of the Condominium Documents as defined in Section 9 hereof. Estimated fees and assessments may increase prior to Closing.

3.        Construction Financing. Seller may borrow construction money from Seller's own lender to construct the Condominium. Purchaser acknowledges that any lender advancing construction funds will have a first mortgage on the Condominium until Closing. At that time, Seller may use all or a portion of the closing proceeds to release the Unit from the lien of the construction mortgage. This Agreement and the Deposit hereunder will not give Purchaser any lien or claim against the Unit, and Purchaser's rights hereunder shall at all times from the date hereof be subordinate to those of any lender holding a mortgage, whether or not such mortgage secures the advancement of construction funds and even if such mortgage is placed of record and encumbers the Condominium after the date of this Agreement.

4.        Construction Specifications

        4.1        Generally. The materials, equipment and fixtures included in and to be used in constructing the Unit will be substantially the same as or similar in quality to those described in the applicable plans and specifications (except as to extras, options and/or upgrades). Seller has the absolute right to make modifications to the plans and specifications. Without limiting the generality of the foregoing, Purchaser specifically agrees that minor changes in the dimensions of rooms, patios, entrances and terraces (if applicable), and changes in the locations of windows, doors, walls, partitions, utility lead-ins and outlets (including, but not limited to, electrical, television and telephone), cable outlets, telephone outlets, air-conditioning components, lighting fixtures and electrical panel boxes may be made by Seller in its reasonable discretion, without prior notice to Purchaser. Such changes may also include, but are not limited to, minor changes in the building location, setbacks and facing, the building's external configuration, its structural components, its finishes and the landscaping associated therewith. It is widely observed construction industry practice for pre-construction plans and specifications for any Unit or building to be changed and adjusted from time to time in order to accommodate on-going, "in the field" construction factors. These changes and adjustments are essential in order to permit all components of the Unit to be integrated into a well-functioning and aesthetically pleasing product in an expeditious manner. Based on the foregoing, Purchaser acknowledges that such changes may occur and agrees that it is reasonable and to Purchaser's benefit, to allow Seller the flexibility to make such changes to the Unit. Purchaser further understands and acknowledges that many of the Units to be constructed within the Condominium require floor plans which are opposite ("flipped") mirror images of the model floor plan and that Seller's agents and/or representatives have fully explained and reviewed this fact with Purchaser and Purchaser fully understands and accepts the floor plan configuration for the Unit. Purchaser further understands and agrees that the following items (which may be seen in illustrations, if any) may not be included with the sale of the Unit: wall coverings, paint colors, accent light fixtures, wall ornaments, drapes, blinds, bedspreads, furniture, furnishings, wet bars, monitoring systems, certain built-in fixtures, special floor coverings, wood trim, upgraded items and/or any other items of this nature which may be added or deleted from time to time. This list of items (which is not all-inclusive) is provided as an illustration of the type of items built-in or placed upon models or shown in illustrations strictly for purposes of decoration and example only. If Purchaser is in doubt about what items are included in the Unit and what items are not included in the Unit, it is Purchaser's responsibility to ask Seller for clarification.

        4.2        Variations. Purchaser further understands and agrees that certain of the finishing items, such as tile, marble, carpet, cabinets, stone, brickwork, wood, paint, stain and mica are subject to size and color variations, grain and quality variations, and may vary in accordance with price, availability and changes by manufacturers from those shown in the model, if any, or in illustrations or brochures or those included in the specifications. Furthermore, if circumstances arise that, in Seller's opinion, warrant changes of suppliers, manufacturers, brand names or items, Seller reserves the right to substitute equipment, materials, appliances, etc., which in Seller's opinion are considered to be of quality substantially similar or equal, or of better quality, subject to their availability. Purchaser also understands that Seller has the right to substitute or change materials and/or stain colors utilized in wood decor, if any. Purchaser acknowledges and understands that the plans and specifications on file for the Unit with the applicable governmental authorities may not be identical to Seller's plans and specifications because Seller's construction requirements may result in changes (there being no legal requirement to file all changes with such authorities). Exposed wood, if any, may vary in color, evenness and non-structural checking and cracking. Further, the Condominium may presently or in the future contain landscaping and/or trees installed by Seller. Such landscaping and/or trees may be removed during the construction and development process. Seller does not guarantee the location, replacement or survival of any trees or landscaping. Variations of a few inches from unit-to-unit are possible.

        4.3        Purchaser Selections. Seller will provide Purchaser, when available, with a checklist of color and/or material choices for those items for which Purchaser will have a choice, if any. If Purchaser fails to complete, execute and return the color and/or material selections to Seller within thirty (30) days from Purchaser's receipt of such checklist from Seller, Purchaser understands that, all choices will be made by Seller and Purchaser will be deemed to have waived Purchaser's right to object to those choices. Colors of all items and materials not included in that checklist will be selected by Seller. Purchaser's selections are FINAL. If Purchaser is purchasing a Unit that is not yet under construction, Purchaser will be allowed one opportunity to request changes, additions, selections or other modifications to the selections made. Any such requests shall be in writing and shall be delivered to Seller prior to the commencement of construction of the Unit. Seller, in its absolute discretion, will accept or reject Purchaser's request for modifications. Should Seller approve the request for a modification, Seller reserves the right to charge Purchaser a non-refundable change order fee of $300.00 per item. In addition to the administrative change order fee, should Seller accept the request for a modification, Seller reserves the right to charge Purchaser for any other direct costs incurred by Seller in accommodating Purchaser's request. Should Seller agree to the modification, Purchaser acknowledges that there may be a delay in the delivery of the Unit. A request for modification by a Purchaser who fails to return the color and/or material selections documents within the required time period, shall be treated in the same manner described above and such request will be subject to the same fees and costs described above. Purchaser acknowledges that Seller may but is in no manner obligated to accept any requests for changes, additions, deletions or modifications. Seller will not accept any request for changes once construction of the Condominium has commenced. For purposes of this Section, construction of the Unit shall be deemed commenced when Seller has provided written instruction to its construction department to commence construction of the Unit. All of the foregoing fees shall be paid to Seller by Purchaser at the time that Seller accepts a request for modification. Dimensions of the Unit may differ from those reflected in brochures, advertisements, artists renderings and marketing floor plans. Actual dimensions may vary upon completion of the Unit.

        4.4        Options, Extras and/or Upgrades. Upon the completion and execution of the document prepared by Seller for the selection by

4.5     <u>Purchaser Acknowledgments</u>.  Purchaser acknowledges and agrees that Purchaser has not relied upon any statements, verbal or written, published by or under the authority of Seller in advertising and promotional matter, including but not limited to newspaper, radio or television advertisements, but has based Purchaser's decision to purchase solely upon Purchaser's personal investigation, observation and the disclosure materials and Condominium Documents provided herewith.

4.6     <u>Landscaping</u>.  Purchaser further agrees and understands that trees and landscaping which may be located within the Condominium may be removed to permit construction. Seller will not be obligated to guarantee the survival of any trees and/or landscaping which are left or planted on any portion of the Condominium. Any loss of trees, shrubs, annuals, or other landscaping shall in no manner obligate Seller to replace them.

5.     <u>Completion Date</u>. It is estimated that the Unit and the Condominium shall be substantially completed by September 1, 2006. Seller agrees to substantially complete construction of the Unit, in the manner specified in this Agreement, by a date not later than two (2) years from the date the Purchaser signs this Agreement; however, such completion date is subject to and shall be extended by reason of acts of God or by reason of circumstances beyond the Seller's control including, but not limited to, work stoppages, the unavailability of labor or material, governmental orders and any other events which would support a defense based upon the impossibility of performance for reasons beyond the Seller's control.

6.     <u>Inspection Prior to Closing</u>.

6.1     PURCHASER WILL BE GIVEN A REASONABLE OPPORTUNITY TO INSPECT THE UNIT WITH SELLER'S REPRESENTATIVE PRIOR TO CLOSING, AND AT THAT TIME PURCHASER WILL SIGN A "<u>WALK-THROUGH INSPECTION REPORT</u>" STATING ANY DEFECTS IN WORKMANSHIP OR MATERIALS OR INCOMPLETE ITEMS WHICH PURCHASER DISCOVERS. ANY SUCH INCOMPLETE OR DEFECTIVE ITEMS NOT SO LISTED WHICH ARE APPARENT OR VISIBLE SHALL BE DEEMED ACCEPTED BY PURCHASER AND ANY CLAIM RELATED THERETO SHALL BE DEEMED FOREVER WAIVED. IF ANY ITEM LISTED IS ACTUALLY DEFECTIVE IN WORKMANSHIP OR MATERIALS IN SELLER'S OPINION (IN ACCORDANCE WITH CONSTRUCTION STANDARDS PREVALENT FOR A SIMILAR UNIT IN THE COUNTY), SELLER WILL BE OBLIGATED TO CORRECT THOSE DEFECTS AT SELLER'S COST WITHIN A REASONABLE PERIOD OF TIME AFTER CLOSING, BUT SELLER'S OBLIGATION TO CORRECT WILL NOT BE A GROUND FOR DEFERRING CLOSING, NOR FOR ANY SETOFF, NOR FOR IMPOSING ANY CONDITION ON CLOSING AS LONG AS THE UNIT IS HABITABLE. THE ISSUANCE OF A CERTIFICATE OF OCCUPANCY (TEMPORARY, PARTIAL OR FINAL) SHALL BE CONCLUSIVE EVIDENCE OF HABITABILITY. PURCHASER SHALL HAVE NO RIGHT TO REQUIRE ESCROWS OR HOLD BACKS OF CLOSING FUNDS, AND NONE WILL BE PERMITTED. IF PURCHASER FAILS TO TAKE ADVANTAGE OF THE PRE-CLOSING INSPECTION ON THE TIME AND DATE SCHEDULED BY SELLER, PURCHASER SHALL BE DEEMED TO HAVE WAIVED THE RIGHT TO SUBMIT A WALK THRU INSPECTION REPORT TO SELLER.

6.2     Purchaser acknowledges that all matters pertaining to the initial construction of the Unit will be performed by Seller and Seller's representatives. Any items pertaining to the construction of the Unit should solely be addressed by Seller's construction representatives; accordingly Purchaser agrees not to discuss any construction related issues with any other party including but not limited to workmen at the Unit, foremen, or construction supervisor. Purchaser acknowledges and agrees that for reasons of safety and to comply with liability and insurance requirements imposed upon Seller, neither Purchaser nor any agent of Purchaser shall, until after Closing, be permitted to enter upon the Unit without Seller's prior written approval. Purchaser agrees not to interfere with or interrupt any workmen at the Unit. Any personal inspections shall be made at times designated by Seller and upon written permission of Seller, and shall not be allowed under any condition prior to the walk through inspection described above and only with Seller's representative. Seller shall not be liable or responsible for any injury, loss or damage resulting from any violation of this Section or any visit to the construction site by Purchaser or Purchaser's agents or representatives. In addition, Purchaser agrees to indemnify and hold Seller harmless from and against any and all injury, loss or damage (including, without limitation, reasonable attorney's fees, paraprofessional fees and court costs at both trial and appellate levels) arising out of or in connection with any violation of this Section or any visit to the construction site by Purchaser or Purchaser's agent or representatives. The foregoing indemnity shall survive Closing and any termination of this Contract prior to Closing. Purchaser may not order any work on the Unit, other than options, upgrades and/or extras that Seller has agreed in writing to provide, until after Closing. Purchaser recognizes that Seller is under no obligation to agree to provide options, extras and/or upgrades. Without limiting the applicability of this Section to all obligations, representations and covenants of Purchaser hereunder, Purchaser specifically acknowledges that any breach by Purchaser of the terms and conditions contained within this Section shall be deemed to be a "material breach" and shall entitle Seller to declare this Agreement to be in default in accordance with the provisions of Section 14 hereof. Seller's failure to promptly take any action with respect to Purchaser's breach of the terms and conditions contained herein shall not be deemed a waiver of any of Seller's rights or remedies hereunder. Whenever this Agreement shall require the Seller to complete or substantially complete an item of construction, unless provided specifically to the contrary herein, such item shall be deemed complete or substantially complete when so completed, in the sole and unfettered opinion of the Seller. Without limiting Seller's rights contained within Section 4 hereof, should Seller fail to provide any item of construction required to be provided or any option, extra and/or upgrade, Purchaser's sole remedy therefor will be to collect an amount from Seller equal to Seller's cost for such item and for Seller's cost of installation of such item had such item been installed at the appropriate time during construction. Without limiting Seller's rights and Purchaser's obligations contained within this Section and elsewhere in this Agreement, should any defects in workmanship or materials be discovered before or after Closing, Purchaser agrees that Purchaser's sole remedy therefor is for Seller to repair or replace the defective item. To the extent permitted by applicable law, Seller disclaims any liability for incidental or consequential damages that may arise from a defective item.

7.     <u>Damage to Condominium and/or the Unit</u>. If between the date of this Agreement and Closing, the Condominium shall be damaged by fire, natural disaster, acts of terrorism or other casualty, the following shall apply:

7.1     Risk of loss to the Condominium and the Unit by fire, natural disaster, acts of terrorism, or other casualty until Closing is assumed by Seller, but without any obligation by Seller to repair or replace the Unit, except that if Seller elects to repair or replace such loss or damage to the Condominium, this Agreement shall continue in full force and effect and Purchaser shall not have the right to reject title or request a credit against or abatement in the Total Purchase Price. If Seller elects to repair or replace such damaged item, Seller shall be entitled to a reasonable period of time within which to complete such repairs or replacement. Any proceeds received from insurance or in satisfaction of any claim or action in connection with such loss or damage shall belong entirely to Seller. If such proceeds shall be paid to Purchaser, Purchaser agrees that such funds are the property of Seller and Purchaser shall promptly upon receipt thereof turn the same over to Seller.

7.2     If Seller notifies Purchaser that Seller does not elect to repair or replace any such loss or damage to the Condominium and the Unit, then this Agreement shall be deemed canceled and shall be of no further force or effect. Seller shall refund to Purchaser all monies deposited hereunder, whereupon the parties shall be released and discharged of all claims and obligations hereunder, except that if Purchaser is then otherwise in default hereunder, Seller shall retain all or a portion of the Deposit and all or a portion of amounts paid to Seller for deposits for options, extras and/or upgrades as and for liquidated damages as provided in Section 14 hereof.

7.3     Risk of loss to the Unit by fire, natural disaster, acts of terrorism or other casualty from and after Closing is assumed by Purchaser. Purchaser should be aware that the Unit and the Condominium, however well constructed, may be subject to damage or destruction by naturally occurring events such as hurricanes and sinkholes. While Seller has no knowledge of sinkholes or naturally occurring gases such as radon in the immediate vicinity of the Condominium, all risks associated with all natural occurrences shall be borne by Purchaser from and after Closing.

8.     Escrow of Deposit.

8.1     Purchaser understands that Paul Feldman, P.A. ("Escrow Agent") whose address is 407 Lincoln Road, Suite 701, Miami Beach, Florida 33139, and whose telephone number is (305) 534-4721, will hold the Deposit in an escrow account (the "Escrow Account"), pursuant to the terms of this Agreement, Chapter 718 of the Florida Statutes, and the Escrow Agreement included within the Prospectus. Seller and Purchaser agree to be bound by the terms of the Escrow Agreement. Any deposits made by Purchaser in excess of ten percent (10%) of the Total Purchase Price may be used by Seller for paying construction costs of the Condominium as provided by Florida law. Purchaser may obtain a receipt for Purchaser's Deposit from the Escrow Agent upon request. No interest shall be paid to Purchaser on the Deposit except if Purchaser shall have properly terminated this Agreement pursuant to its terms or pursuant to the provisions of Chapter 718 of the Florida Statutes, in which event Purchaser shall receive the interest if any which has been earned on Purchaser's Deposit. Escrow Agent may deposit monies held in the Escrow Account in savings or time deposit accounts at a bank or savings and loan association insured by an agency of the United States Government and/or, if approved in writing by Seller, in securities of the United States Government or any agency thereof, with interest and dividends, if any, paid to Seller upon the payment of the Deposit to Seller. By signing this Agreement, Purchaser expressly authorizes Escrow Agent to disburse Purchaser's payments held in the Escrow Account to Seller's account at Closing, or to Seller upon Purchaser's default. Purchaser agrees to indemnify and hold Escrow Agent harmless from any claims or damages that may result from Escrow Agent's escrowing or disbursing of the Deposit, other than those claims or damages resulting from Escrow Agent's gross negligence or willful malfeasance. Escrow Agent shall not be responsible for any act or omission to act, unless occurring due to its sole gross negligence or willful malfeasance, and upon making delivery of the monies that Escrow Agent holds in accordance with the terms hereof, Escrow Agent shall have no further liability. Seller and Purchaser, jointly and severally, shall indemnify and hold Escrow Agent harmless from any and all damages or losses arising by reason of Escrow Agent having acted as Escrow Agent, or in connection therewith (except for damages or losses arising out of gross negligence or willful malfeasance), including but not limited to all costs and expenses incurred by Escrow Agent in connection with the filing of an interpleader action, together with reasonable attorneys' fees, paraprofessional fees and legal costs at trial and upon appeal.

8.2     Purchaser acknowledges that Deposits may be used by Seller if alternatively assured in accordance with Section 718.202 of the Florida Statutes. Purchaser's execution of this Agreement constitutes Purchaser's consent and authorization to Seller to use alternatively assured Deposits.

9.     Condominium Documents.  Purchaser acknowledges receipt of copies of those instruments and documents listed on the Receipt for Condominium Documents included within the Prospectus. The Prospectus for the Condominium (the "Documents Receipt"), all such documents, which are required to be furnished to Purchaser by Chapter 718 of the Florida Statutes (collectively the "Condominium Documents"), are incorporated into this Agreement by reference. The Purchaser agrees that occupancy of the Unit shall at all times be subject to the provisions of the Condominium Documents. Seller has delivered to Purchaser a full set of the Condominium Documents, and Purchaser shall execute the Documents Receipt in the form contained within the Prospectus. The Seller reserves the right, in its sole discretion, to amend any of the Condominium Documents, provided that a copy of such amendment is transmitted to Purchaser. Notwithstanding anything to the contrary contained herein, upon recordation of the Condominium Documents, Seller shall only have the right to amend the Condominium Documents in accordance with the Condominium Act. The Seller shall make available to Purchaser, for Purchaser's inspection at Seller's place of business that is convenient to the site, a copy of the complete set of Seller's plans and specifications for the construction of the Unit and the common elements appurtenant to the Unit. Notwithstanding any other provision herein to the contrary, if this Agreement is terminated for any reason whatsoever, Purchaser shall return to Seller the Condominium Documents delivered to Purchaser in the same condition received, reasonable wear and tear excepted, or Seller shall be entitled to charge One Hundred Dollars ($100.00) to Purchaser as a result of the termination, to defray Seller's costs and expenses resulting from the preparation, printing and delivery of the Condominium Documents. This Section shall survive the termination of this Agreement.

10.     Purchaser's Option.

THIS AGREEMENT IS VOIDABLE BY BUYER (PURCHASER) BY DELIVERING WRITTEN NOTICE OF BUYER'S (PURCHASER'S) INTENTION TO CANCEL WITHIN FIFTEEN (15) DAYS AFTER THE DATE OF EXECUTION OF THIS AGREEMENT BY THE BUYER (PURCHASER) AND RECEIPT BY BUYER (PURCHASER) OF ALL OF THE ITEMS REQUIRED TO BE DELIVERED TO BUYER (PURCHASER) BY DEVELOPER (SELLER) UNDER SECTION 718.503, FLORIDA STATUTES. THIS AGREEMENT IS ALSO VOIDABLE BY BUYER (PURCHASER) BY DELIVERING WRITTEN NOTICE OF THE BUYER'S (PURCHASER'S) INTENTION TO CANCEL WITHIN FIFTEEN (15) DAYS AFTER THE DATE OF RECEIPT FROM DEVELOPER (SELLER) OF ANY AMENDMENT WHICH MATERIALLY ALTERS OR MODIFIES THE OFFERING IN A MANNER THAT IS ADVERSE TO BUYER (PURCHASER). ANY PURPORTED WAIVER OF THESE VOIDABILITY RIGHTS SHALL BE OF NO EFFECT. BUYER (PURCHASER) MAY EXTEND THE TIME FOR CLOSING FOR A PERIOD OF NOT MORE THAN FIFTEEN (15) DAYS AFTER BUYER (PURCHASER) HAS RECEIVED ALL OF THE ITEMS REQUIRED. BUYER'S (PURCHASER'S) RIGHT TO VOID THIS AGREEMENT SHALL TERMINATE AT CLOSING.

Should Purchaser desire to void this Agreement pursuant to Purchaser's option as above referenced, Seller must receive written notice of cancellation signed by all persons signing this Agreement as "Purchaser." Such written notice must be delivered to Seller or sent to Seller at the address of Seller as listed on the first page of this Agreement. Upon proper and timely cancellation, Deposits shall be refunded by Seller within fifteen (15) days of Seller's receipt of written notice of cancellation, or such greater amount of time as may be necessary for clearance of any Deposit in the form of a check.

11.   Closing Date. Without limiting Section 5 of this Agreement, Purchaser acknowledges and agrees that Seller has the right in its sole discretion to schedule the date, time and place for closing of the transaction contemplated by this Agreement ("Closing") and that Purchaser shall close on such Closing date. Prior to Closing, a temporary or permanent certificate of occupancy covering the Unit must be issued by the proper governmental agency. Purchaser will be given at least ten (10) days notice of Closing date, time and place. Seller is authorized to postpone the date of Closing at its discretion. Seller must, however, give Purchaser reasonable notice of the new Closing date. Any notice of Closing may be given verbally, by telephone, telegraph, telex, telefax, mail or other means of communication at Seller's option. An affidavit of one of Seller's employees or representatives that such notice was given will be conclusive for purposes of proving that notice was given. All notices will be given to Purchaser at the address or by use of the telephone number(s) specified on Page 1 of this Agreement unless Seller has received written notice from Purchaser of any change therein prior to the date notice of Closing is given. The fact that Purchaser fails to receive the notice of Closing because Purchaser has failed to advise Seller of any change of address or phone number, or because Purchaser has failed to pick up a letter when Purchaser has been advised of an attempted delivery or for any other reason, shall not relieve Purchaser of Purchaser's obligation to close on the scheduled date, unless Seller otherwise agrees in writing to postpone the Closing date. If Seller agrees in writing to reschedule Closing at Purchaser's request or because Purchaser (if a corporation) has failed to produce all corporate documents requested by Seller, or for any other reason (except for delay required by Seller), Seller may impose a late charge equal to $125.00 per day for every day from the original Closing date through the date that the transaction closes and all prorations shall be as of the original Closing date. Purchaser agrees that the late charge (if any be imposed by Seller) is appropriate in order to cover Seller's administrative and other expenses resulting from a delay in Closing. Seller is not required to agree to reschedule Closing, but Seller may reschedule Closing in Seller's sole discretion.

12.   Closing. Title to the Unit to be delivered to Purchaser at Closing will be marketable and insurable, subject only to those matters set forth below. In connection therewith:

12.1   Title to the Unit shall be subject to the following: (1) zoning, building codes, bulkhead laws, ordinances, regulations, rights or interests vested in the United States of America or the State of Florida; (2) real estate taxes and other taxes for the year of conveyance and subsequent years including taxes or assessments of any special taxing or community development district (including assessments relating to capital improvements and bonds); (3) the general printed exceptions contained in an ALTA Owner's Title Insurance Policy; (4) utility easements, sewer agreements, telephone agreements, cable agreements, telecommunication agreements, monitoring agreements, restrictions and reservations common to any plat affecting title to the Unit and the Condominium; (5) the Condominium Documents; (6) any laws and restrictions, covenants, conditions, limitations, reservations, agreements or easements recorded in the Public Records (for example, property use limitations and obligations, easements (right-of-way) and agreements relating to telephone, gas or electric lines, water and sewer lines and drainage, provided they do not prevent use of the Unit for single family residential purposes); and (7) acts done or suffered by Purchaser and any mortgage obtained by Purchaser for the purchase of the Unit. It is Purchaser's responsibility to review and become familiar with each of the foregoing title matters, some of which are covenants running with the land. If any title defects are discovered by Purchaser after Closing, Purchaser's sole remedy shall be to make a claim to Purchaser's title insuror. Purchaser agrees for Purchaser and Purchaser's heirs, personal representatives, successors and assigns to observe and be bound by all of the terms and conditions of the matters set forth above.

12.2   Seller is not required to furnish Purchaser with an abstract of title. If desired, Purchaser may obtain the same at Purchaser's expense. Seller shall convey title to Purchaser at Closing by delivery to Purchaser of a Special Warranty Deed (the "Deed") describing the Unit which shall convey title to Purchaser subject to all matters described in Section 12.1 above. Any such matters omitted from the Deed shall nevertheless be deemed to be included in the Deed. This Section shall expressly survive Closing and the delivery of the Deed. The acceptance of the Deed by Purchaser shall be deemed to be full performance and discharge of every agreement and obligation on the part of Seller to be performed pursuant to this Agreement, except those which are herein specifically deemed to survive Closing or which may survive by operation of law (if any). Seller shall provide at Closing (i) an affidavit complying with the Foreign Investment in Real Property Tax Act of 1980, as amended; and (ii) an Assignment of Parking Space, not in recordable form, assigning the Parking Space to the Unit.

12.3   If Seller cannot provide marketable and insurable title to the Unit, as described above, Seller will have a reasonable period of time (at least one hundred and twenty (120) days) from the date of the scheduled Closing to attempt to correct any defects in title; provided, however, Seller shall not be obligated to incur any expense to clear title to the Unit. If Seller cannot or elects not to correct the title defects, Seller shall so notify Purchaser within such period, and Purchaser may thereafter elect (by written notice from Purchaser to Seller) one of the following two (2) options: (1) to accept title to the Unit in the condition offered (with defects) and pay the balance of the Total Purchase Price for the Unit (without set off or deduction therefor), thereby waiving any claim with respect to such title defects and Purchaser will not make any claims against Seller because of the title defects; or (2) to cancel this Agreement and receive a full refund of all monies deposited hereunder. If all monies deposited hereunder are refunded, Purchaser agrees to accept such monies as full payment of Seller's liability hereunder, whereupon this Agreement shall be terminated and Seller shall thereafter be relieved and released of all further liability hereunder. Purchaser shall not thereafter have any rights to make any additional claims against Seller. In the event Purchaser does not notify Seller in writing within five (5) business days from the receipt of Seller's notice (time being strictly of the essence) as to which option Purchaser elects, Purchaser shall be conclusively presumed to have elected option (2) set forth above. Purchaser shall be responsible for any pending and proposed liens, taxes and/or assessments for public improvements. Seller will be responsible for public improvement liens which have been certified as of the date of Closing. At Closing, Purchaser agrees to pay to Seller the balance of the Total Purchase Price and any additional amounts Purchaser owes under this Agreement by cashier's check or by wire transfer of funds. Official check, bank check or personal check will not be accepted.

13.   Closing Costs. PURCHASER UNDERSTANDS AND AGREES THAT IN ADDITION TO THE BALANCE OF THE TOTAL PURCHASE PRICE, PURCHASER SHALL PAY THE FOLLOWING DESCRIBED CLOSING COSTS AT CLOSING ("CLOSING COSTS"):

13.1   A Developer's Fee (the "Developer's Fee") in an amount equal to one and three quarters percent (1.75%) multiplied by the Total Purchase Price. The Developer's Fee represents a reimbursement by the Purchaser to the Seller of a portion of the various fees and expenses which have been and will be incurred by the Seller in connection with the acquisition and development of the Condominium. The Developer's Fee is separate and apart from any and all other Closing Costs which will be incurred by the Purchaser in connection with the Purchaser's acquisition of the Unit and the Developer's Fee shall be paid in addition to, and not as a part of, the Total Purchase Price.

13.2   The costs associated with recordation of the Deed.

13.3   State of Florida documentary stamps to be placed upon the Deed.

13.4     The premium for issuance of the Owner's Policy of Title Insurance (the "Owner's Policy") in favor of the Purchaser with respect to the Unit, in the amount of the Total Purchase Price.

13.5     Working capital contribution to the Condominium Association in an amount equal to two (2) monthly condominium maintenance assessments for the Unit.

13.6     One (1) month condominium maintenance assessment, in advance, together with the prorata condominium maintenance assessment for the balance of the month during which the Closing takes place.

13.7     All costs which any mortgagee requires to be paid if the Purchaser obtains mortgage loan financing for the purchase of the Unit including, but not limited to, loan fees, discount points, credit report fees, appraisal fees, title insurance premiums, recordation expenses and documentation preparation expenses. If the Purchaser obtains mortgage loan financing for the purchase of the Unit and if the closing agent designated by the Seller acts as the settlement agent for the mortgage loan closing, then the Purchaser shall pay the following mortgage loan closing related charges: (i) settlement fee in the amount of $350.00; (ii) title examination fee in the amount of $225.00; (iii) premium in the amount of $200.00 for the simultaneously issued mortgagee policy of the insurance; and (iv) premiums for the endorsements to t he mortgagee policy of title insurance which will be required by the mortgage lender. Nothing contained within this subparagraph 13.7 shall, however, be deemed or construed to cause the Purchaser's obligations under this Agreement to be contingent in any manner upon the Purchaser obtaining mortgage loan financing for the purchase of the Unit.

13.8     Current expenses of the Unit (for example: utility fees, taxes, special assessments, current monthly assessments due to the Condominium Association), will be adjusted between Seller and Purchaser as of the original Closing date.   Purchaser shall reimburse Seller for any prepaid expenses pertaining to the Unit such as utility deposits, insurance premiums, interim service fees, cable fees, assessments and capital contributions made to the Condominium Association  paid by Seller in advance of Closing.

13.9     All impact fees paid by the Seller in relation to the development of the Condominium, prorated for the Unit.

13.10     Purchaser and Seller agree that if Closing takes place in a year in which the real property taxes for the Condominium are on one bill and/or are combined with other property, then the real property taxes for the year of Closing shall be prorated as of the date of Closing based upon an equitable estimated assessment to be reasonably determined by Seller. Purchaser shall pay to Seller at Closing Purchaser's share of such taxes. Purchaser and Seller further agree that if Closing takes place in a year in which the real property taxes are separately assessed against individual units in the Condominium, proration of same shall take place as of the date of Closing based on the tax bill for the prior year if the bill for the current year is not yet available. Purchaser shall pay such tax bill and any request for real property tax reproration for the year in which Closing occurs (whether such request is (i) due to the fact that the actual taxes for the year of Closing vary from the amount used in the Settlement Statement or (ii) due to clerical or scrivener's error in the Settlement Statement) must be submitted by Purchaser and received by Seller no later than by April 30 of the year following the year in which Closing occurs.  In the event that Seller shall pay such tax bill, the aforementioned method of reproration shall also be applicable.

13.11     Any additional construction costs resulting from increases in the cost of construction materials and/or resulting from modifications or changes in building codes, governmental rules, regulations or requirements, or the enforcement of any of the same, after the date of this Agreement, shall be paid by Purchaser over and above the Total Purchase Price at the time of Closing. The foregoing shall include, but not be limited to, any increase in the cost of construction materials  and/or any increase in impact fees, water and sewer connection fees and similar charges imposed by the County, water and sewer authorities and other governmental agencies.

<u>NOTE:</u>     IN THE EVENT THE PURCHASER ELECTS TO HAVE THE CLOSING AGENT DESIGNATED BY THE SELLER PROVIDE THE OWNER'S POLICY TO THE PURCHASER, THEN THE SELLER SHALL BE RESPONSIBLE FOR THE PAYMENT OF: (i) THE COSTS ASSOCIATED WITH RECORDATION OF THE DEED; (ii) STATE OF FLORIDA DOCUMENTARY STAMPS TO BE PLACED UPON THE DEED; AND (iii)THE PREMIUM FOR ISSUANCE OF THE OWNER'S POLICY IN FAVOR OF THE PURCHASER WITH RESPECT TO THE UNIT.

14.     <u>Default.</u>

14.1     <u>Purchaser's Default.</u>  Should Purchaser fail to close on the title to the Unit as herein provided, or fail to perform or observe any of the Purchaser's obligations hereunder (including failing to make payment of any deposit within three (3) days of its due date), Seller may, at its option, cancel this Agreement by notice to Purchaser, which cancellation will be effective upon the giving of such notice. In such event, all deposits and other payments made by Purchaser under this Agreement, shall be retained by Seller as liquidated and agreed upon damages for Purchaser's default, and all rights and privileges of Purchaser hereunder shall thereafter terminate.  Seller has removed the Unit from the market and has incurred substantial direct and indirect expenses relative to sales, models, advertising and similar items, and Purchaser recognizes that no method could determine the precise damage resulting from Purchaser's default and that such liquidated damages are a fair and reasonable remedy. The cancellation of this Agreement and the retention of all deposits and other payments made by Purchaser under this Agreement, as liquidated and agreed upon damages, shall be the Seller's sole remedy in the event of Purchaser's default, and upon cancellation of this Agreement, neither party shall have any further obligation to the other. In the event that Purchaser's default is caused by Purchaser's failure to make payment of any deposit within three (3) days of its due date, Seller may, in its absolute discretion, exercise all of the rights explained above <u>or</u> may accept the late payment plus interest thereon at the rate of eighteen percent (18%) per annum from the date the payment was due until the date the payment was accepted by Seller.

14.2     <u>Seller's Default.</u>

14.2.1     <u>Prior to Closing.</u>

14.2.1.1     <u>Notice.</u> Purchaser shall give written notice to Seller following Seller's default under this Agreement as a condition precedent to seeking any remedy against Seller.  The written notice shall specify the default in detail.  The notice to be given pursuant to this Section shall be delivered to Seller in the same manner noted in Section 29 of this Agreement.

14.2.1.2  Cure Period. Seller shall have a reasonable period of time (not less than thirty (30) days nor more than ninety (90) days) from the date Seller receives the written notice (the "Cure Period") to correct any default or to otherwise respond to Purchaser in the event Seller determines that no default has occurred and/or defect exists.

14.2.1.3  Right to Inspect and Correct. Seller shall have the Cure Period to inspect and correct any alleged default or defect or to otherwise respond to Purchaser in the event Seller determines that no default has occurred and/or defect exists. The Cure Period shall be extended by any period of time that Purchaser refuses to allow Seller to inspect the Unit and/or perform tests as required by Section 14.2.1.3 hereof.

14.2.1.4  Expiration of Cure Period. Purchaser agrees that Purchaser shall seek no remedy against Seller prior to the expiration of the Cure Period. Seller shall have the right but not the obligation to take action during the Cure Period and/or to respond to any notice received from Purchaser.

14.2.1.5  Remedy. In the event that Seller is unable to cure the alleged default during the Cure Period (except in the event of a title defect as set forth in Section 12 above), Purchaser shall have the right to terminate this Agreement and receive a full refund of the Deposit and a full refund of all deposits or payments for options, extras and/or upgrades. In the event Purchaser rightfully terminates this Agreement, Seller and Purchaser shall be released from any and all further obligations hereunder. Notwithstanding anything contained in this Section 14 to the contrary, in the event of Seller's default under Section 5 of this Agreement, the Cure Period shall not apply and Purchaser shall have all remedies available at law and in equity without limitation or restriction.

14.2.2   Post-Closing.

14.2.2.1  Notice. Purchaser shall give written notice to Seller of any alleged defect or default with respect to the Unit, arising under this Agreement or under law after Closing, as a condition precedent to seeking any remedy against Seller with respect to the Unit. The written notice shall specify the defect or default in detail. The notice to be given pursuant to this Section shall be delivered to Seller in the same manner noted in Section 29 of this Agreement.

14.2.2.2  Right to Inspect and Correct. Seller shall have the Cure Period to inspect and correct any alleged default or defect or to otherwise respond to Purchaser in the event Seller determines that no default has occurred and/or defect exists. The Cure Period shall be extended by any period of time that Purchaser refuses to allow Seller to inspect the Unit and/or perform tests as required by Section 14.2.3. hereof.

14.2.2.3  Expiration of Cure Period. Purchaser agrees that Purchaser shall seek no remedy against Seller prior to the expiration of the Cure Period. Without limiting the foregoing, Purchaser shall not bring any litigation against Seller respecting the Unit until the expiration of the Cure Period (which shall be deemed to be ninety (90) days from Seller's receipt of Purchaser's written notice unless Seller agrees in writing to any shorter period). Seller shall have the right, but not the obligation, to take action during the Cure Period and/or respond to any notice received from Purchaser.

14.2.2.4  Master Deed Restrictions. The provisions of this Section 14.2.2. and Section 14.2.3. shall be deemed to constitute covenants running with the land.

14.2.3   Purchaser's Obligation to Permit Inspection. Purchaser agrees that once Purchaser has given written notice to Seller pursuant to Section 14.2.1.1. or Section 14.2.2.1., whichever is applicable, Purchaser shall be obligated to permit Seller and its agents to perform inspections of the Unit and to perform all tests and make all repairs/replacements deemed necessary by Seller to respond to such notice at all reasonable times. Purchaser agrees that any inspection, test and/or repair/replacement scheduled on a business day between 9 a.m. and 5 p.m. shall be deemed scheduled at a reasonable time. The rights reserved in this Section 14.2.3. shall include the right of Seller to repair or address, at Seller's sole option and expense, any aspect of the Unit deemed defective by Seller during its inspection of the Unit.

15.   Seller's Use of the Condominium. As long as Seller or its successors or assigns owns any portion of the property that comprises or may comprise a portion of the Condominium, Seller and its agents may maintain sales and leasing offices and models within the Condominium to assist Seller in selling, reselling, and leasing properties in the Condominium and properties located outside the Condominium. As long as Seller, or any nominees of Seller, owns any Unit in the Condominium, Seller and/or its nominees shall have the right and privilege to maintain general sales offices in and about the Condominium, including model units, and to have their employees present on the premises to show Units, use the common elements of the Condominium and, without limitation, to do any and all other things necessary or appropriate by them to sell, resell, or lease Units and other properties owned by Seller, all without charge or contribution; provided, however, that such activities shall be carried on in such a manner as will not unreasonably interfere with the Purchaser's enjoyment of the Unit.

16.   Warranties.

16.1   Purchaser acknowledges that at the time of execution of this Agreement, Seller has no reason to know of any particular purpose Purchaser has in purchasing the Unit and the items of personal property to be located therein, other than for normal residential use.

16.2   Except for the warranties contained in the Deed and any warranties pursuant to the Florida Condominium Act, no other warranties, guarantees, promises, express or implied, have been made to or relied upon by Purchaser in making the determination to execute this Agreement. Purchaser acknowledges that Purchaser has personally reviewed the Condominium Documents and has found both the Unit and the Condominium, as described therein, acceptable and suitable for Purchaser's purposes, that Purchaser has relied upon Purchaser's own judgment in making such determinations, and that there were no warranties, guarantees or promises, express or implied, with respect to the Unit or the Condominium made by any of Seller's agents, employees or representatives or by any independent contractor of Seller, except those which have been specifically set forth in this Agreement and in the Condominium Documents.

Purchaser acknowledges that Seller (and Seller's employees, agents, brokers and other representatives) has made no additional warranty, representation or undertaking of any kind, express or implied, and that the statutory warranties provided for in the Florida Condominium Act shall be in lieu of any other warranty, express or implied including, but not limited to, any implied warranty of merchantability, habitability and/or quality or fitness for a particular purpose. Purchaser agrees that, except as provided herein, Purchaser is buying and shall accept possession of the Unit in the condition it is in at the time of Purchaser's inspection thereof, subject to those items which Seller agrees to correct by so indicating on the checklist to be prepared at the time of the walk through inspection.

16.3     Normal swelling, expansion and contraction of materials and construction, and any cracks appearing as a result thereof or as a result of settlement of, in or on the Unit or the Condominium shall not be deemed to be construction defects. Upon Closing, Seller shall deliver and/or assign to Purchaser all manufacturers' warranties, if any, covering the consumer products (if any) to be sold and transferred to Purchaser hereunder, provided, however, SELLER SHALL NOT THEREBY BE DEEMED TO WARRANT ANY SUCH CONSUMER PRODUCT, NOR TO ADOPT ANY LIABILITY FOR ANY SUCH MANUFACTURERS' WARRANTY THEREOF. The terms of this Section 16 shall survive Closing of this transaction.

16.4     No Warranties for Third Party Construction.

16.4.1     Seller does not warrant any of the work performed in the Unit by third party contractors, not hired by Seller, prior to or after Closing.

16.4.2     Seller shall not be liable for any defects in the work performed by third party contractors not hired by Seller, nor for any adverse impact to the Unit or Condominium caused thereby.

16.4.3     Further, should Purchaser elect to use a third party contractor that is a subcontractor of Seller, Purchaser acknowledges that Seller makes no representations relative to the performance by such third party contractor.

16.4.4     This Section 16 shall survive Closing.

17.     Deposits. Any reference to Deposit or Deposits herein shall refer collectively to all amounts deposited with Seller under this Agreement, and under any addendum or amendment hereto, except for any deposits or payments made by Purchaser for options, extras and/or upgrades. Any and all deposits or payments for options, extras and/or upgrades shall be non-refundable except (i) in the event of Seller's default, (ii) if the Unit is damaged, as described in Section 7, and Seller does not elect to repair or replace the Unit and/or (iii) Seller is unable to provide marketable and insurable title, as described in Section 12. All monies deposited under the terms of this Agreement, except for the balance due at Closing, may be made by check drawn on a Florida bank, subject to collection. All payments must be made in United States funds. If the Deposit is held in escrow, it shall be disbursed in accordance with the applicable terms and conditions of this Agreement and in accordance with the terms and provisions of the Escrow Agreement contained within the Prospectus for this Condominium and in accordance with the provisions of Chapter 718, Florida Statutes.

18.     Agreement Not to be Recorded. Purchaser covenants that Purchaser shall not record this Agreement (or any memorandum thereof) in the Public Records of the County. Purchaser agrees, if Purchaser records this Agreement, to pay all of Seller's legal fees, paraprofessional fees and expenses incurred in removing the cloud in title caused by such recordation. Seller's rights under this Section shall be in addition to Seller's remedies for Purchaser's default provided in Section 14 of this Agreement.

19.     Transfer or Assignment. Purchaser has no right to assign, sell or transfer Purchaser's interest in this Agreement (whether voluntarily or by operation of law or otherwise) without Seller's prior written consent; provided, however, that the Seller shall provide Seller's prior written consent to an assignment of the Purchaser's interest in this Agreement, upon the receipt of an assignment fee in an amount equal to one half of one percent multiplied by the purchase price for the Unit being assigned by the assignee of the Purchaser's interest in this Agreement. If Purchaser is a corporation, other business entity, trustee or nominee, a transfer of any material equity or beneficial or principal interest shall constitute an assignment of this Agreement. If Purchaser attempts to assign this Agreement in violation of this Section 19, Seller shall have the right to declare Purchaser in default and Seller shall be entitled to all remedies available under Section 14 hereof. Purchaser agrees that Seller may withhold its consent with or without any reason or condition in any manner it chooses (if it gives it at all) and may charge Purchaser a reasonable fee to cover administrative costs incurred in considering whether or not to grant consent.

20.     Persons Bound By This Agreement. If Purchaser dies or in any manner loses legal control of Purchaser's affairs, this Agreement will bind Purchaser's heirs and legal representatives. If Purchaser has received Seller's permission to assign or transfer this Agreement, then Purchaser's approved assignees shall be bound by the terms of this Agreement. If more than one person signs this Agreement as Purchaser, each such person shall be jointly and severally liable for full performance of all of Purchaser's duties and obligations hereunder.

21.     Interpretation and Computation of Time. The use of the masculine gender in this Agreement shall be deemed to refer to the feminine or neuter gender, and the singular shall include the plural, and vice versa, whenever the context so requires. This Agreement reflects the negotiated agreement of the parties, each represented by competent legal counsel, or by parties who chose not to be represented by counsel. Accordingly, this Agreement shall be construed as if both parties jointly prepared it, and no presumption against one party or the other shall govern the interpretation or construction of any of the provisions of this Agreement. Any reference in this Agreement to the time periods of less than six (6) days shall, in the computation thereof, exclude Saturdays, Sundays and legal holidays. Any reference in this Agreement to time periods of six (6) days or more shall, in computation thereof, include Saturdays, Sundays and legal holidays. If the last day of any such period is a Saturday, Sunday or legal holiday, the period shall be extended to 5:00 p.m. on the next full business day.

22.     Waiver. Seller's waiver of any of Seller's rights or remedies shall not operate to waive any other of Seller's rights or remedies or to prevent Seller from enforcing the waived right or remedy in another instance.

23.     Survival, Incorporation and Severability. The provisions and disclaimers in this Agreement which are intended to have effect after Closing shall survive Closing. The explanations and disclaimers set forth in the Condominium Documents are incorporated into this Agreement. In the event

that any clause or provision of this Agreement shall be void or unenforceable, such clause or provision shall be deemed deleted so that the balance of this Agreement shall be enforceable.

24.    Section Headings. The Section headings in this Agreement are for convenience only and shall not affect the meaning, interpretation or scope of the provisions which follow them.

25.    Florida Law. Any disputes that develop under this Agreement will be settled according to Florida law.

26.    Inducement. Purchaser acknowledges that the sole inducement to purchase the Unit is the Unit to be constructed.

27.    Time of the Essence. Purchaser acknowledges that time is of the essence in connection with this transaction.

28.    Notice. Except as provided in Section 11 with respect to notices of the scheduled date of Closing, any notice required or permitted to be given in connection with this Agreement shall be in writing and shall be sent by United States certified mail with return receipt requested, professional overnight courier or telefax (with confirmation and copy by (i) certified mail if Purchaser's address is within the United States or (ii) overnight professional courier if to a Purchaser whose address is outside of the United States) to Purchaser or Seller at the addresses on Page 1 of this Agreement, and additionally to Seller by hand delivery at Seller's sales office. All notices shall only be effective upon receipt or refusal to accept receipt (by failure to accept delivery or otherwise).

29.    RADON GAS. This disclosure is required by Section 404.056 of the Florida Statutes. Radon is a naturally occurring radioactive gas that, when it has accumulated in a building in sufficient quantities, may present health risks to persons who are exposed to it over time. Levels of radon that exceed federal and state guidelines have been found in buildings in Florida. Additional information regarding radon and radon testing may be obtained from your county health department.

30.    Energy Rating. Pursuant to Section 553.996 of the Florida Statutes, Purchaser may request that Seller cause a State-Certified Energy Rater to perform an energy efficiency rating on the Unit being purchased. Purchaser hereby releases Seller from any responsibility or liability for the accuracy or level of the rating and Purchaser understands and agrees that this Agreement is not contingent upon Purchaser approving the rating, that the rating is solely for Purchaser's own information and that Purchaser will pay the total cost of the rating.

31.    Insulation Disclosure. Pursuant to Title 16, Chapter I, Section 460.16 of the Code of Federal Regulations, the Insulation Disclosure Addendum attached hereto as Schedule A is incorporated herein by reference and made a part hereof.

32.    Selling Agent and Cooperating Broker. Unless a Cooperating Broker Addendum indicating otherwise is attached hereto, Purchaser represents to Seller that Purchaser has not consulted, dealt or negotiated with any real estate broker, salesperson or agent other than any real estate broker engaged by Seller. Purchaser agrees that Seller shall not be responsible for the payment of a commission to any real estate broker, salesperson or agent other than to any real estate broker engaged by Seller and Purchaser agrees to indemnify and hold Seller harmless from and against any and all loss and liability, including attorney's and paraprofessional's fees and costs at all levels, resulting from or arising out of any representation or breach of a representation or warranty set forth in this Section 32. Purchaser understands and agrees that this Section shall survive Closing and the delivery of the Deed.

33.    Counterparts and Telefaxed Signatures. This Agreement shall be validly executed when signed in counterparts. The effective time of the Agreement shall be the date and time when the last of the parties to sign executes this Agreement. Signatures may be given via telefax transmission and shall be deemed given as of the date and time of the transmission of this Agreement by telefax to the other party.

34.    Additional Changes. Purchaser agrees that it may be necessary (at any time and from time to time) after Purchaser executes this Agreement for Seller to change the terms and provisions of this Agreement and/or the Condominium Documents to comply with and conform to the rules and regulations (as same may exist and as same may be promulgated from time to time) of any governmental agency or subdivision. In addition, Seller shall have the right to amend the Condominium Documents for development or other purposes. The parties shall execute such further documents and instruments, and perform such further acts, as shall be necessary and advisable from time to time to carry out the intent and purpose of this Agreement.

35.    Venue. Purchaser acknowledges that the Unit and Condominium are located in Brevard County, Florida. Accordingly, an irrebuttable presumption exists that the only appropriate venue for the resolution of any dispute lies in the County. In addition to the foregoing, Purchaser and Seller agree that the venue for resolution of any dispute under this Agreement lies in Brevard County, Florida.

36.    Construction Activities. ALL OWNERS, OCCUPANTS AND USERS OF THE CONDOMINIUM ARE HEREBY PLACED ON NOTICE THAT (1) SELLER AND/OR ITS AGENTS, CONTRACTORS, SUBCONTRACTORS, LICENSEES AND OTHER DESIGNEES, AND/OR (2) ANY OTHER PARTIES WILL BE, FROM TIME TO TIME, CONDUCTING BLASTING, EXCAVATION, CONSTRUCTION AND OTHER ACTIVITIES WITHIN OR IN PROXIMITY TO THE CONDOMINIUM. BY THE ACCEPTANCE OF THEIR DEED OR OTHER CONVEYANCE OR MORTGAGE, LEASEHOLD, LICENSE OR OTHER INTEREST, AND BY USING ANY PORTION OF THE CONDOMINIUM, EACH SUCH OWNER, OCCUPANT AND USER AUTOMATICALLY ACKNOWLEDGES, STIPULATES AND AGREES (i) THAT NONE OF THE AFORESAID ACTIVITIES SHALL BE DEEMED NUISANCES OR NOXIOUS OR OFFENSIVE ACTIVITIES, HEREUNDER OR AT LAW GENERALLY, (ii) NOT TO ENTER UPON, OR ALLOW THEIR CHILDREN OR OTHER PERSONS UNDER THEIR CONTROL OR DIRECTION TO ENTER UPON (REGARDLESS OF WHETHER SUCH ENTRY IS A TRESPASS OR OTHERWISE ANY PROPERTY WITHIN OR IN PROXIMITY TO THE CONDOMINIUM WHERE SUCH ACTIVITY IS BEING CONDUCTED (EVEN IF NOT BEING ACTIVELY CONDUCTED AT THE TIME OF ENTRY, SUCH AS AT NIGHT OR OTHERWISE DURING NON-WORKING HOURS), (iii) SELLER AND THE OTHER AFORESAID RELATED PARTIES SHALL NOT BE LIABLE FOR ANY AND ALL LOSSES, DAMAGES (COMPENSATORY, CONSEQUENTIAL, PUNITIVE OR OTHERWISE), INJURIES OR DEATHS ARISING FROM OR RELATING TO THE AFORESAID ACTIVITIES, EXCEPT RESULTING DIRECTLY FROM SELLER'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT, (iv) ANY PURCHASE OR USE OF ANY PORTION OF THE CONDOMINIUM HAS BEEN AND WILL BE MADE WITH FULL KNOWLEDGE OF THE FOREGOING AND (v) THIS ACKNOWLEDGMENT

AND AGREEMENT IS A MATERIAL INDUCEMENT TO SELLER TO SELL, CONVEY, AND/OR ALLOW THE USE OF THE UNIT. THIS SECTION SHALL SURVIVE CLOSING.

37.     Not Binding.  This Agreement shall not be binding on Seller unless and until executed by an authorized agent or officer of Seller.

38.     Construction Industries Recovery Fund.  Pursuant to Section 489.1425 of the Florida Statutes, Seller provides the following notice. PAYMENT MAY BE AVAILABLE FROM THE CONSTRUCTION INDUSTRIES RECOVERY FUND IF YOU LOSE MONEY ON A PROJECT PERFORMED UNDER CONTRACT, WHERE THE LOSS RESULTS FROM SPECIFIED VIOLATIONS OF FLORIDA LAW BY A STATE-LICENSED CONTRACTOR. FOR INFORMATION ABOUT THE RECOVERY FUND AND FILING A CLAIM, CONTACT THE FLORIDA CONSTRUCTION INDUSTRY LICENSING BOARD AT THE FOLLOWING TELEPHONE NUMBER AND ADDRESS (904) 727-6530, 7960 ARLINGTON EXPRESSWAY, SUITE 300, JACKSONVILLE, FLORIDA 32211.

39.     Notice.  FLORIDA LAW CONTAINS IMPORTANT REQUIREMENTS YOU MUST FOLLOW BEFORE YOU MAY FILE A LAWSUIT AGAINST A CONTRACTOR, SUBCONTRACTOR, SUPPLIER OR DESIGN PROFESSIONAL FOR AN ALLEGED CONSTRUCTION DEFECT IN YOUR Unit. SIXTY (60) DAYS BEFORE YOU FILE YOUR LAWSUIT, YOU MUST DELIVER TO THE CONTRACTOR, SUBCONTRACTOR, SUPPLIER OR DESIGN PROFESSIONAL A WRITTEN NOTICE OF ANY CONSTRUCTION CONDITIONS YOU ALLEGE ARE DEFECTIVE AND PROVIDE THE CONTRACTOR AND ANY SUBCONTRACTOR, SUPPLIER OR DESIGN PROFESSIONAL THE OPPORTUNITY TO REPAIR OR PAY FOR THE ALLEGED CONSTRUCTION DEFECTS. YOU ARE NOT OBLIGATED TO ACCEPT ANY OFFER MADE BY THE CONTRACTOR OR ANY SUBCONTRACTOR, SUPPLIER OR DESIGN PROFESSIONAL.  THERE ARE STRICT DEADLINES AND PROCEDURES UNDER FLORIDA LAW, AND FAILURE TO FOLLOW THEM MAY AFFECT YOUR ABILITY TO FILE A LAWSUIT.

40.     ENTIRE AGREEMENT.  PURCHASER CERTIFIES THAT PURCHASER HAS READ EVERY PROVISION OF THIS AGREEMENT AND EACH ADDENDUM ATTACHED HERETO (IF ANY) AND THAT THIS AGREEMENT CONSTITUTES THE ENTIRE AGREEMENT BETWEEN PURCHASER AND SELLER. THIS AGREEMENT IS THE ENTIRE AGREEMENT FOR THE SALE AND PURCHASE OF THE UNIT AND ONCE THIS AGREEMENT IS SIGNED THIS AGREEMENT CAN ONLY BE AMENDED IN WRITING. PRIOR AGREEMENTS, REPRESENTATIONS, UNDERSTANDINGS, AND ORAL STATEMENTS NOT REFLECTED IN THIS AGREEMENT HAVE NO EFFECT AND ARE NOT BINDING ON SELLER. PURCHASER ACKNOWLEDGES THAT PURCHASER HAS NOT RELIED ON ANY REPRESENTATIONS, NEWSPAPER, RADIO OR TELEVISION ADVERTISEMENTS, WARRANTIES, STATEMENTS, OR ESTIMATES OF ANY NATURE WHATSOEVER, WHETHER WRITTEN OR ORAL, MADE BY SELLER, SALES PERSONS, AGENTS, OFFICERS, EMPLOYEES, CO-OPERATING BROKERS (IF ANY) OR OTHERWISE EXCEPT AS HEREIN SPECIFICALLY REPRESENTED. PURCHASER HAS BASED PURCHASER'S DECISION TO PURCHASE THE UNIT ON PERSONAL INVESTIGATION, OBSERVATION AND REVIEW OF THE CONDOMINIUM DOCUMENTS.

IN WITNESS WHEREOF, the parties have hereunto executed this Agreement on the day and year set forth below their respective signatures.

ANY PAYMENT IN EXCESS OF TEN PERCENT (10%) OF THE PURCHASE PRICE MADE TO DEVELOPER (SELLER) PRIOR TO CLOSING PURSUANT TO THIS AGREEMENT MAY BE USED FOR CONSTRUCTION PURPOSES BY THE DEVELOPER (SELLER).

_Ursula Stenger_
(Witness)

Print name: _Ursula Stenger_


_Evil Stenger_
(Purchaser)

Print Name: _Evil SHEMPER_

Date: _October 11, 2005_


(Witness)

Print name: _____


(Purchaser)

Print Name: _____

Date: _____

SELLER

UNIVERSITY VILLAGE AT MELBOURNE, LLLP, a Florida limited liability limited partnership

By: _B_____

Date: _____                    Authorized Agent

# SARAGA & LIPSHY, P.A.
## COUNSELORS AT LAW

BRIAN LOUIS LIPSHY, ESQ.
ALSO ADMITTED IN WASHINGTON, D.C.
DIRECT NUMBER: (561) 330-0660 x 202
EMAIL: lipshy@slpalaw.com

March 22, 2007

*Via U.S. Certified Mail*
*Return Receipt Requested*

University Village at Melbourne, LLLP
1001 North Federal Highway
Suite 315
Hallandale, Florida 33009

Re:     Agreement for Purchase and Sale ("**Agreement**") by and between Enid
        Shemper ("**Buyer**") and University Village at Melbourne, LLLP, a Florida
        limited liability limited partnership ("**Seller**"), collectively (the "**Parties**").

Dear Gentlemen:

Please be advised the undersigned has been retained to represent Enid Shemper in the above referenced matter.  Based upon our review of the Agreement, addenda, and relevant Florida and Federal law, this letter shall serve as notice that the Buyer is revoking the Agreement and terminating same because Seller has failed to comply with (i) Fla. Stat. § 689.261 and (ii) the reporting and registration requirements of the Interstate Land Sales Full Disclosure Act ("**ILSA**"). 15 U.S.C. § 1701, et seq.

Florida Statute § 689.261 provides that a prospective purchaser must be presented with a Property Tax Disclosure Summary prior to or at the execution of a contract for sale and purchase of residential property ("**Tax Disclosure**").  If the Tax Disclosure, in a form prescribed by the Statute, is not included in the contract, the contract must refer to and incorporate by reference the Tax Disclosure.  The Agreement fails to provide the required Tax Disclosure. If a Tax Disclosure in conformity with Fla. Stat. § 689.261 was provided to our client, please provide a copy of the same for our review.  If the Tax Disclosure was never provided, the Agreement is in direct contradiction and violation of Florida law.

If a statute grants a right or imposes a duty, the statute may be construed as conferring by implication the power necessary for the exercise of the right or the performance of the duty.  *Girard Trust Co. v. Tampashores Development Co.*, 117 So. 786, 788 (Fla. 1928). Florida Statute § 689.261 clearly imposed a duty upon Seller to provide a Tax Disclosure. Seller breached this duty.  As a result of Seller's breach, Buyer is entitled to rescind the Agreement.  Therefore, Buyer elects to rescind the Agreement and demand is hereby made that all monies on deposit be immediately returned.

PLAINTIFF'S
EXHIBIT
B

SARAGA & LIPSHY, P.A.
COUNSELORS AT LAW

In addition to violating Florida law, the Agreement is revocable under ILSA. In order to be exempt under ILSA the contract must comply with the exceptions contained in 15 U.S.C. § 1702. Section 1702 provides that the contract must "obligate" the seller to complete construction of the home within a period of two (2) years. Florida law holds that in order for the developer to be 'obligated' to complete the building within two years, the obligation must be "unrestricted *and* the contract must not limit the purchaser's right to seek specific performance or damages." [emphasis added] *Samara Development Corp. v. Marlow*, 556 So.2d 1097, 1100 (Fla. 1990), *Marco Bay Associates v. Vandewalle*, 472 So. 2d 472 (Fla. 2d DCA 1985). Therefore, there are two separate requirements. First, the developer has the unqualified and unconditional obligation to complete the building in two years (the "**Unconditional Two Year Requirement**"). *Hamptons Development Corp. of Dade v. Sackler*, 522 So. 2d 1035 (Fla. 3d DCA 1988). Second, the developer may not limit the purchaser's rights to affirm the contract and seek damages or specific performance (the "**Limitation of Remedies**"). *Samara Development Corp. v. Marlow*, 556 So.2d 1097, 1098 (Fla. 1990), *Marco Bay Associates v. Vanderwalle*, 472 So. 2d 472, 474 (Fla. 2d DCA 1985).

**Section 5** of the Agreement specifically provides no such "obligation" on Seller. The Seller has conditioned the completion date on "acts of God... circumstances beyond the Seller's control including, but not limited to, work stoppages, the unavailability of labor or material, governmental orders and any other events which would support a defense based upon the impossibility of performance for reasons beyond Seller's control." Therefore, the Seller has not unconditionally obligated itself to complete construction within two (2) years. A developer is not relieved of its obligation or given an extension of time for any reason – even for circumstances and conditions beyond the developer's control. *Hamptons Development Corp. of Dade v. Sackler*, 522 So. 2d 1035 (Fla. 3d DCA 1988) *Fortunato v. Windjammer Homebuilders, Inc.*, 2006 WL 208777 (MD Fla. 2006) and *Schatz v. Jockey Club, Phase III, Ltd.*, 604 F.Supp. 537, 542 (SD Fla. 1985), *Arbid v. G.L. Homes of Lake Charleston Associates, Ltd.*, MC 94-17778-RL, Official Records Book 8788 Page 1526, *G.L. Homes of Lake Charleston Associates, Ltd. v. Arbid*, AP 95-3496 AY. Seller is thus disqualified from the exemption found in Section 1702 of ILSA and must therefore comply with all of ILSA's reporting requirements.

As a result of Seller's failure to meet the exemption requirements in 15 U.S.C. § 1702, a Property Report in accordance with 15 U.S.C. § 1703(d) is required. ILSA requires the Seller provide a prospective purchaser the right of revocation within two years if the purchaser has not received a Property Report prior to execution. 15 USC § 1703(c). Since the Agreement failed to qualify for exemption and failed to make the required ILSA disclosures, the Agreement is revocable, as provided by 15 USC §1703(c). Therefore, this letter shall serve as our client's revocation of the Agreement.

# SARAGA & LIPSHY, P.A.
### COUNSELORS AT LAW

University Village at Melbourne, LLLP
March 22, 2007
Page 3 of 3

For the reasons provided herein, the Agreement is revocable. Having voided and revoked the Agreement demand is hereby made that Seller remit *all* deposits – in cash or certified funds – to the undersigned within ten (10) days. Withholding the deposits or any portion thereof will be regarded as a conversion of the Buyers' property, for which we will institute legal proceedings without delay.

Please give this letter your immediate attention. Should you have any questions, please do not hesitate to contact the undersigned.

Very truly yours,

SARAGA & LIPSHY, P.A.

Brian Louis Lipshy

BLL: ajv
cc:    Enid Shemper

Paul Feldman, P.A.
407 Lincoln Road
Suite 701
Miami Beach, Florida 33139